UNITED STATES, Appellee

v

JAMES N. MURRAY, Private First Class,
U. S. Army, Appellant

12 USCMA 434, 31 CMR 20

No. 14,860

July 14, 1961

*First Lieutenant Alonzo F. Davis* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Ralph W. Wofford.*

*First Lieutenant Jerome Nelson* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel James G. McConaughy.*

## Opinion of the Court

HOMER FERGUSON, JUDGE:

Arraigned and tried before a general court-martial, the accused pleaded not guilty to a charge of stealing and opening mail matter, in violation of Uniform Code of Military Justice, Article 134, 10 USC § 934. He was found guilty and sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for three years, and reduction to the lowest enlisted grade. The convening authority approved the sentence. The board of review affirmed but reduced the period of confinement involved to two years. We granted accused's petition for review on issues dealing with the propriety of a search of his belongings and

whether certain subsequent searches and a confession were the products of this earlier quest.

The operative facts depicted in the record are quite simple. The regularly assigned commanding officer of accused's unit, Captain Rumbaugh, was absent on temporary duty in another city. Upon his departure, the next ranking officer, Lieutenant Stepp, published orders announcing his assumption of command. However, he was momentarily expecting the arrival of his family in the command and, prior to Captain Rumbaugh's departure, had secured permission to absent himself from duty in order to be with them.

On the evening of August 15, 1960, Lieutenant Stepp informed the next senior unit officer, Chief Warrant Officer Mullahey, that his family had arrived and that he would be in late or not at all on the following day. He also told Mullahey that "he was in charge and unless anything came up short of death, not to disturb me." Nothing was specifically said about authority to conduct searches in the unit billets.

On the following morning, a German cleaning woman brought Mr. Mullahey a valid, uncashed American money order which she had found in a barracks trash can. Mullahey inspected the can and found a considerable number of undelivered letters. All were addressed to persons stationed at Army Post Office 172. As he was aware that the accused was in charge of breaking down the mail directed to that address, he conducted a search of the accused's quarters. There, he found letters addressed to persons stationed at Army Post Office 172 but did not remove them. Lieutenant Stepp was informed of the developments and came to the unit, where he assumed control over the subsequent investigations. Based on Mr. Mullahey's discoveries, the Criminal Investigation Detachment was notified. Personnel assigned to the Base Post Office were searched by investigators with their consent. The accused was observed hurriedly leaving the room and entering a latrine. He returned quickly. However, an examination of a trash can in the latrine disclosed the presence of several letters which had been torn up. When pieced together, it appeared that they also were addressed to Army Post Office 172.

Subsequently, Lieutenant Stepp authorized another search of accused's quarters. This disclosed the presence of the mail formerly discovered by Mr. Mullahey as well as thirty-six other letters. Confronted with this mass of incriminating evidence, the accused, after proper warning under Code, supra, Article 31, 10 USC § 831, executed a voluntary pretrial statement in which he confessed his guilt.

From the foregoing, it will be seen that resolution of the question of the legality of the search initially conducted by Mr. Mullahey bears strongly on the issue of the lawfulness of the other searches and the manner in which accused's confession was obtained. With respect to this quest, the defense contends that Mr. Mullahey was not authorized to conduct it as he was not the unit's commanding officer and had not been delegated the power to conduct searches. On the other hand, the Government contends that Mullahey was in fact the unit's commander on August 16, 1960, or, if he was not, his search was conducted in an unofficial capacity. See United States v Volante, 4 USCMA 689, 16 CMR 263; United States v Rogan, 8 USCMA 739, 25 CMR 243.

Under the view which we take of this case, we need not inquire into the troublesome area of delegation of authority to conduct searches. In our opinion, the record affords a sufficient basis for the law officer's determination that Mullahey was acting as the unit commander at the time of his search and was thus empowered to examine the accused's belongings.

The commanding officer of a unit, charged as he is with the maintenance of discipline over his command and the responsibility for United States property under his control, is, upon the determination that probable cause exists so to act, authorized under military law either personally to conduct a search of the quarters and property of a member of his command or to

cause such an examination to be carried out by another. United States v Brown, 10 USCMA 482, 28 CMR 48; Manual for Courts-Martial, United States, 1951, paragraph 152; United States v Walsh, 21 CMR 876, 883; Richardson v Zuppann, 81 F Supp 809 (MD Pa) (1949), affirmed *per curiam,* 174 F2d 829 (CA 3d Cir) (1949); Grewe v France, 75 F Supp 433 (ED Wis) (1948). There is no doubt that Mullahey had probable cause to suspect the accused of committing a mail offense. He had been presented with a valid money order found in a trash can. His personal inspection of the container resulted in the discovery of numerous other pieces of mail, all of which were addressed to Army Post Office 172. From his normal duties, he knew that the accused was charged with the responsibility for local handling of mail directed to that address. Accordingly, he was almost compelled to infer that mail matter was being wrongfully used and that the accused was probably the criminal agent involved. As probable cause to search accused's property thus clearly existed, we turn to the issue whether Mullahey was a commanding officer at the time of the initial search.

Army Regulations 600–20 provide:

"In the event of the death, disability, *or temporary absence of the commander of any element of the Army*, the next senior regularly assigned officer present for duty . . . will assume command until relieved by proper authority." [AR 600–20, paragraph 9a.] [Emphasis supplied.]

In United States v Williams, 6 USCMA 243, 19 CMR 369, we had occasion to construe a similar regulatory provision with reference to the propriety of a Deputy Corps Commander acting as convening authority in the latter's temporary absence. In holding that the Deputy Commander succeeded to his superior's role, we stated, at page 248:

"Of course, whenever the regularly assigned commander returned to the Corps area, his deputy was divested of authority—but by standing ready to assume the former's duties at all times, General Canham insured the smooth functioning of the unit regardless of the necessary absences of its permanent head. We have no doubt that this constituted the principal purpose served by the Army Regulations on which we principally base our action here. Accordingly, we conclude that when General Williams was absent from the IX Corps location, the deputy commander, *General Canham—as 'the next senior present on duty'—temporarily assumed the duties and powers of commanding general of the organization, and was entitled, as the holder of that office pro tem to consider and weigh the evidence and evaluate the charge in the instant case.* Indeed, during such an absence the latter officer could lawfully have referred the present charge for trial, and himself have appointed the court-martial which tried the accused before us." [Emphasis partially supplied.]

In United States v Bunting, 4 USCMA 84, 15 CMR 84, we reached the same conclusion with respect to the assumption of command by a chief of staff, the next senior naval officer present, when the actual naval commander temporarily departed from his organization, although he remained physically present in the geographical area. Thus, we held, at page 90:

". . . Hence, under the authority of Article 1371 [of Navy Regulations, 1948], during the absence of Admiral Joy, Admiral Ofstie had the power to convene a general court-martial in his own right. Such exercise of power is consistent with, and explains the exercise of the command functions by Admiral Joy during some of the time he served as Senior United Nations Delegate. The record shows he was not continuously in Korea. At such times as he returned to his headquarters, he necessarily resumed command. Admiral Ofstie would then be divested of his authority under Article 1371; . . ."

In like manner, it must be concluded

that the command of accused's unit devolved upon Chief Warrant Officer Mullahey when he was left "in charge" by Lieutenant Stepp on August 15. As provided in the Army Regulations cited supra, he assumed the responsibilities of the office as the next senior officer present. True it is that no formal order was promulgated transferring command from Stepp to him, as is normally contemplated, but an assumption expected to be of such short duration is hardly likely to be so nicely announced. And, indeed, in United States v Bunting, supra, we refused to find such an announcement a necessary prerequisite to entry upon the office. In the same case, as well as in United States v Williams, supra, we also found that the presence of the actual commander in the same geographical area and the fact that his absence from his headquarters was temporary was of no moment. In short, the regulatory provision for the assumption of command by the next senior officer is predicated, not upon the availability of the individual who has relinquished his responsibilities, but upon the need of the services to have authority exercised over units in a continuous stream in order that missions will be executed without fail.

Here, we have both a relinquishment of command by Lieutenant Stepp and its actual assumption by the next senior officer present. Those conditions being satisfied, it is clear that the office of unit commander devolved upon Mr. Mullahey despite the temporary nature of Lieutenant Stepp's absence. Accordingly, we hold that he had authority to conduct the initial search of accused's property. That fact being established, it is clear that the subsequent lawful searches and the confession were the fruit of a perfectly sound tree.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.