UNITED STATES, Appellee

v

WALTER KUGIMA, Sergeant, BENJAMIN L. RHODES, Sergeant,
JOHN WHITE, Sergeant, JOSEPH E. LIGHTFOOT, Corporal,
ROGER D. SPEARS, Corporal, and ROBERT L. MADDOX,
Corporal, U. S. Marine Corps, Appellants

16 USCMA 183, 36 CMR 339

No. 19,149

April 8, 1966

*Captain L. G. Bohlen*, USMC, argued the cause for Appellants, Accused.
*Lieutenant John P. Meade*, USNR, was on the pleadings for Appellants,
Accused.

*Colonel J. E. Hanthorn*, USMC, argued the cause for Appellee, United

States. *Lieutenant Colonel Daniel F. McConnell,* USMC, was on the pleadings for Appellee, United States.

## Opinion of the Court

FERGUSON, Judge:

The accused were tried by a general court-martial convened in the Third Marine Division, and convicted of several violations of the Uniform Code of Military Justice. They urge that the court-martial which tried them was a nullity, not having been appointed by the Commanding General, Third Marine Division.

On May 5, 1965, charges against the accused were referred to a general court-martial for trial by Colonel Andrew I. Lyman, USMC, as Commanding Officer, Third Marine Division. On May 11, 1965, Colonel Lyman, in the same capacity, signed the orders appointing the general court-martial which tried them. Colonel Lyman's normal position with the Division was that of Chief of Staff, Major General Collins being the Division Commanding General and Brigadier General Karch being the Assistant Division Commander.

Colonel Lyman came to act as convening authority in the following manner. The Third Marine Division was stationed on Okinawa. It was ordered to Viet Nam for military duty. On April 28, 1965, Major General Collins left Okinawa and proceeded to Saigon, Viet Nam, for conferences. From there, he went to Danang, Viet Nam, to direct operations of certain advance elements of the Division which had been assigned there as the Ninth Marine Expeditionary Brigade, under General Karch. Additional elements of the Division landed in Viet Nam, and they, together with the Ninth Marine Expeditionary Brigade, constituted the III Marine Amphibious Force under the command of General Collins. On May 6, 1965, General Collins established an operational command post at Danang, staffed solely for combat functions by three additional officers. This staff was subsequently enlarged by additional staff officers.

General Collins considered himself to remain the Commanding General of the Third Division while he was in Viet Nam. However, his functions there were purely operational in character and the bulk of the Division and its staff remained in Okinawa during the critical period. In his absence and that of the Assistant Division Commander, he, pursuant to pertinent service regulations, considered Colonel Lyman to be in charge of administration and courts-martial matters. He did not seek to exercise court-martial jurisdiction in Viet Nam, and Colonel Lyman remained responsible for such matters until General Karch returned to Okinawa during the period May 15–20, 1965.

In brief, then, the situation presented is one in which a Commanding General, with some of the elements of his division, has established an operational command post in an active theater of operations, leaving his Chief of Staff in charge of the normal division headquarters and the bulk of its troops until these could be closed on the forward element. In addition, it is to be noted that the Assistant Division Commander likewise was physically absent from the Division Headquarters and was with the forward brigade.

Code, supra, Article 22, 10 USC § 822, provides pertinently:

"(a) General courts-martial may be convened by—

. . . . .

(3) *the commanding officer* of a Territorial Department, an Army Group, an Army, an Army Corps, *a division,* a separate brigade, or a corresponding unit of the Army or Marine Corps." [Emphasis supplied.]

Also pertinent to the consideration of Colonel Lyman's authority are the regulations mentioned by General Collins and here relied on by the Government:

"2. During the absence of . . . a commanding general of a subdivi-

**184**

sion of a fleet marine force *from his command or from his headquarters*, and when such officer has not directed that he be succeeded in command as provided in paragraph 1, . . . the deputy or assistant commander or the chief of staff if a deputy or assistant commander is not assigned, *shall have authority to issue the orders required to carry on the established routine and to perform the administrative functions of the command, and shall be the officer commanding for the time being for administration and for the exercise of general court-martial jurisdiction in the command. . . ."* [Emphasis supplied.] [Article 1371.2, United States Navy Regulations, 1948.]

It is basic military law that jurisdictional error is present and a court-martial proceeding of no effect unless there are present "these indispensable requisites: *That the court was appointed by an official empowered to appoint it;* that the membership of the court was in accordance with the law with respect to number and competency to sit on the court; and that the court was invested by act of Congress with power to try the person and the offense charged." (Emphasis supplied.) Manual for Courts-Martial, United States, 1951, paragraph 8; United States v Ortiz, 15 USCMA 505, 36 CMR 3; United States v Robinson, 13 USCMA 674, 33 CMR 206.

Moreover, as has been frequently pointed out:

". . . A court-martial is the creature of statute, and, as a body or tribunal, it must be convened and constituted in entire conformity with the provisions of the statute, or else it is without jurisdiction." [McClaughry v Deming, 186 US 49, 62, 46 L ed 1049, 22 S Ct 786 (1902).]

Thus, it has been stated:

"A court martial organized under the laws of the United States is a court of special and limited jurisdiction. It is called into existence for a special purpose and to perform a particular duty. When the ob-

ject of its creation has been accomplished it is dissolved. . . . To give effect to its sentences it must appear affirmatively and unequivocally that the court was legally constituted." [Runkle v United States, 122 US 543, 555, 30 L ed 1167, 7 S Ct 1141 (1887).]

See also Dynes v Hoover, 20 How 65 (U. S. 1858); United States v Brown, 206 US 240, 51 L ed 1046, 27 S Ct 620 (1907); United States v Vanderpool, 4 USCMA 561, 16 CMR 135.

Bearing these injunctions in mind, and turning to the provisions of Code, supra, Article 22, it is clear that, with regard to the case before us, the authority to appoint a general court-martial is expressly devolved by Congress upon *"the commanding officer* of a . . . division, . . . or a corresponding unit of the . . . Marine Corps."* (Emphasis supplied.) Code, supra, Article 22(a)(3). Discipline is a function of command and, as it is to the commander concerned that all look as ultimately responsible for its effective enforcement, it is not surprising to note that it was to him that Congress entrusted the power to convene courts-martial. The question, therefore, resolves itself into determining whether Colonel Lyman was the "commanding officer" of the Third Marine Division on the pertinent dates, under the applicable law and regulations. The issue is not entirely new to us.

In United States v Bunting, 4 USCMA 84, 15 CMR 84, we were confronted with a similar situation. There, in the critical period, the Commander, Naval Forces, Far East, was designated as Senior United Nations Delegate during armistice negotiations in Korea. During his absence from his headquarters, although he was still within the geographical limits of his command, his Chief of Staff convened Bunting's court-martial. Under regulations almost identical to Article 1371.2, supra, we held that he had the authority to do so, declaring at pages 88–89:

"The efficient operation of a military unit, especially in combat, requires that the commanding officer be in full and effective control of his organization. If his circumstances are such that he is unable to give his undivided attention and considered judgment to the functions of the command, there is certainly some basis for a succession of command. Patently, Admiral Joy was in such a situation when in Korea as the Senior United Nations Delegate. The multitude of responsibilities affecting the command could not possibly be submitted to him for prompt decision. It goes without saying that while at the advance site of the United Nations Delegation in Korea, or at the truce table itself, Admiral Joy could not give even minimal consideration to those matters. Admiral Joy realized himself that his presence in Korea would so interfere with the performance of his duties as Commander Naval Forces, Far East, that he would be required to relinquish the command to Admiral Ofstie, and he so informed Admiral Sherman, the Chief of Naval Operations. Consequently, we conclude that Admiral Joy was absent from his command within the meaning of Article 1371 during the time that he was in Korea in the performance of his duties as Senior United Nations Delegate. This conclusion is not out of harmony with Navy rulings that Article 1371 is inoperative when an officer is temporarily absent from his headquarters but 'still functioning' in his official capacity within the geographical boundaries of his command. See: Letter from the Judge Advocate General of the Navy, November 23, 1951, Subject: Review Authority of Courts-Martial (File No. :JAG:I:INK:GI:WAC: nam). *The difference lies in the continued functioning as commander. The record here incontrovertibly shows that Admiral Joy did not, and practically could not, function as commander while in active performance of his duties as Senior Delegate. Under these circumstances, we hold that Article 1371 became operative during Admiral Joy's absence from his command.*

. . . . .

"When the commanding officer is absent and does not direct the senior line officer to succeed to command, the chief of staff has 'authority to issue the orders required to carry on the established routine and to perform the administrative functions of the command,' subject to action in emergencies or unforeseen situations by the senior line officer present. *This provision marks a line of demarcation between administrative and operational succession to command. Such a division is well-recognized in the Naval establishment and finds expression on the highest level.* See Navy Regulations, 1948, Chapter I; Navy Department General Order No. 9, April 25, 1951. Evidence of the distinction appears in this very case." [Emphasis supplied.]

It would appear this decision is dispositive. In the regulation before us, it is made even more explicit than in United States v Bunting, supra, that there is a well-recognized line of demarcation in the naval establishment between operational and administrative functions of command. To relieve the Commanding General of his burden and permit him to devote full time and attention to matters elsewhere, the regulation provides that his absence from either "his command or from his headquarters" will cause a devolution upon either the Assistant Division Commander or the Chief of Staff of the function of "officer commanding for the time being for administration and for the exercise of general court-martial jurisdiction in the command." Article 1371.2, supra. That is precisely what occurred here. On Major General Collins' departure for Saigon, and during Brigadier General Karch's simultaneous absence, their functions became restricted to purely operational matters and Colonel Lyman in fact and in law became the Commanding Officer of Third Marine Division. And, in this connection, it is worthy of note that not only the Division Headquarters

but the bulk of its troops remained on Okinawa and under his direct control. At what point it and they returned to the normal command of General Collins on their transfer to Viet Nam, we need not and do not decide. Suffice it to say, at the period here involved, that situation had not arisen.

Defense counsel, however, note that command of the Division could only devolve upon Colonel Lyman "if a deputy or assistant commander is not assigned." Article 1371.2, supra. Giving the narrowest interpretation to the word "assigned," it is urged that the fact of General Karch's assignment as Assistant Division Commander, although he was absent in Viet Nam and then in command of the Ninth Brigade, precluded Colonel Lyman as Chief of Staff from becoming Commanding Officer. The defense construction of the term "assigned" is, in light of the whole regulation, far too restrictive.

Regulations, if possible, are to be construed to give effect to their several parts, so that, in ██ their entirety, they will constitute a meaningful whole. United States v Ortiz, supra. Those now before us were intended to provide for an orderly devolution of command from the Commanding General, through the Assistant Division Commander, to the Chief of Staff, depending upon the absence of the first two officers from the command or headquarters. In context, it is patent that use of the word "assigned" was intended to convey the meaning of presence with the command or headquarters. Otherwise, there would be no need for provision of further devolution in the ordinary case. Regulations are not to be interpreted to bring about impracticable and absurd results. United States v Masusock, 1 USCMA 32, 1 CMR 32. We, therefore, reject the defense contention and, as General Karch was absent from the command and headquarters, we hold his "assignment" was no impediment to Colonel Lyman's assumption of command.

The defense also contends that the conclusion Colonel Lyman was Commanding Officer while General Collins functioned as Commanding General, albeit in a limited operational capacity, leads to the absurd result of having two commanders of the Division and, hence, two convening authorities. This argument was considered in *Bunting*, supra, in part, and it was there pointed out that naval practice has long permitted exercise of the functions of command by an officer commanding for the time being, in the absence of the real commander in connection with operational matters. Moreover, it does not follow from this division of responsibility that there are two convening authorities created where there should only be one. To the contrary, the regulation and practice constitute the successor in command the sole individual responsible for administration and convening courts-martial. It is designed to permit the Commanding General to concentrate solely on his primary mission of insuring success in wartime operations, by relieving him of all the usual command functions and duties. Therefore, until he returns to his headquarters or otherwise resumes his role as commander, he exercises no prerogative of that office dealing with military justice. In short, it is to "the commanding officer" that authority to appoint courts-martial is given by Code, supra, Article 22, and, here, only Colonel Lyman was serving in that capacity.

In sum, then, under the statute and Article 1371.2, Navy Regulations, supra, we find Colonel Lyman to have been the Commanding Officer, Third Marine Division, at the time the court here was appointed to try accused's case. United States v Bunting, supra. In consequence, we conclude he had the authority, under Code, supra, Article 22, as a division commander, to convene general courts-martial, and no jurisdictional error is present here.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge KIL-DAY concur.