*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

_____

### UNITED STATES
Appellant

**v.**

### Roberto ARMENDARIZ, Master Sergeant
United States Marine Corps, Appellee

**No. 19-0437**

Crim. App. No. 201700338

Argued June 4, 2020—July 20, 2020

Military Judges: Matthew J. Kent, Brian E. Kasprzyk,
and Mark D. Sameit

For Appellant: *Lieutenant Kimberly Rios*, JAGC, USN (argued); *Colonel Mark K. Jamison*, USMC, *Lieutenant Timothy C. Ceder*, JAGC, USN, and *Brian K. Keller,* Esq. (on brief).

For Appellee: *Tami L. Mitchell,* Esq. (argued); *Lieutenant Clifton E. Morgan III*, JAGC, USN, and *David P. Sheldon*, Esq. (on brief).

Amicus Curiae for Appellant: *Tiberius Davis* (law student), *Brian Sanders* (law student), *Michael Zakrajsek* (law student), and *Sharon R. Fairley,* Esq. (supervising attorney) (on brief) — the University of Chicago Law School.

Amicus Curiae for Appellee: *Joseph Begun* (law student), *Laura Brodkin* (law student), *Laura Valentor* (law student), *Judith P. Miller,* Esq. (supervising attorney), and *Erica Zunkel,* Esq. (supervising attorney) (on brief) — the University of Chicago Law School.

Judge MAGGS delivered the opinion of the Court, in which Chief Judge STUCKY, and Judges RYAN, OHLSON, and SPARKS, joined.

_____

Judge MAGGS delivered the opinion of the Court.[1]

_____

[1] Oral argument in this case was originally scheduled to be heard at the University of Chicago Law School in Chicago, Illinois,

A general court-martial consisting of officer and enlisted members found Appellee guilty, contrary to his pleas, of one specification of wrongful use of government property, one specification of fraternization, one specification of sexual assault, one specification of abusive sexual contact, and one specification of adultery in violation of Articles 92, 120, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 920, 934 (2012).[2] The court-martial sentenced Appellee to eighteen months of confinement and a dishonorable discharge. The convening authority approved the sentence as adjudged.

The United States Navy-Marine Corps Court of Criminal Appeals (NMCCA) affirmed the finding that Appellee was guilty of fraternization. *United States v. Armendariz*, 79 M.J. 535, 557 (N-M. Ct. Crim. App. 2019). But the NMCCA set aside the other findings and the sentence after determining that the military judge had abused his discretion in denying a motion to suppress evidence obtained from Appellee's body, property, and workspace. *Id.* The NMCCA authorized a rehearing on the specifications for which it had set aside the findings. *Id.* Alternatively, the NMCCA authorized either a rehearing to determine the sentence for the fraternization specification or the approval of a sentence of no punishment.

---

as part of the Court's Project Outreach. *See United States v. Mahoney*, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003). The practice of holding arguments at law schools and other locations was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system. The travel restrictions and quarantine due to the COVID-19 pandemic required cancellation of the Project Outreach trip and the case was ultimately heard by teleconference several weeks later. In addition to our standing gratitude to both sides of the bar in supporting the Court on Project Outreach, this Court also commends and thanks the University of Chicago Law School faculty, students, and staff, who continue to demonstrate an uncommon interest in and commitment to the military justice system, appearing with great clarity, credibility, and persuasion on brief.

[2] Before the entry of pleas, the Government withdrew one specification of abusive sexual contact in violation of Article 120, UCMJ. The court-martial found Appellee not guilty of one specification of sexual assault by bodily harm in violation of Article 120, UCMJ.

*Id.* at 557–58. The NMCCA denied the Government's motion for rehearing.

The Government then filed a certificate of review, pursuant to Article 67(a)(2), UCMJ, 10 U.S.C. § 867(a)(2), presenting the following three issues:

I. Whether the lower court erred in overturning the military judge's admission of evidence where the military judge found the official who authorized the search was the acting commander with full authority and control over the remain behind element, except for authority to impose nonjudicial punishment and convene courts-martial?

II. Whether the lower court erroneously applied the exclusionary rule under Mil. R. Evid. 311(a)(3) by failing to appropriately balance the benefits of deterrence against the costs to the justice system, and thereby erred in overturning the military judge's decision not to apply the exclusionary rule?

III. Whether the lower court erred in finding the good-faith exception did not apply where this court has, in *United States v. Chapple*, 36 M.J. 410 (C.M.A. 1993), held the exception applies even when the individual issuing that search authorization lacked authority under Mil. R. Evid. 315(d)(1), and here law enforcement reasonably believed the acting commander was authorized to issue search authorizations?

We answer the first certified issue in the affirmative and do not reach the second and third certified issues.

### I. Background

#### A. The Charged Offenses and the Investigation

Appellee and Sergeant N were assigned to Marine Wing Support Squadron 373 (MWSS-373), Marine Air Group 11 (MAG-11), 3d Marine Air Wing (3d MAW), and were stationed at Marine Corps Air Station (MCAS) Miramar, California. On the morning of June 25, 2016, they met at their squadron's building and entered Appellee's private office. Sergeant N testified that Appellee locked the door, turned off the light, pushed aside her shorts and underclothing and penetrated her vulva with his fingers without her consent. Sergeant N

testified that she told Appellee to stop but he removed his shorts and underwear and penetrated her vulva with his penis. Sergeant N testified that when she continued to insist that he stop, Appellee ceased and dressed himself. Sergeant N further testified that Appellee then commented on her breasts and also touched her breasts with his hands underneath her shirt without her consent.

An investigation followed the incident. As part of the investigation, a special agent assigned to the Naval Criminal Investigative Service requested several command authorizations for searches and seizures. The special agent presented the requests to the squadron's executive officer, Major Cera T. Benbow, whom the special agent thought was the acting commander and officer in charge of the members of the squadron in Miramar. Major Benbow authorized searches and seizures leading to the discovery of evidence from Appellee's cell phones and clothing and the recovery of DNA evidence from his person.

## B. The Motion to Suppress

Appellee subsequently moved to suppress this evidence on grounds that Major Benbow was not competent to authorize searches and seizures under Military Rule of Evidence (M.R.E.) 315(d) because she was not the commander of MWSS-373. The military judge made the following findings of fact relevant to determining Major Benbow's authority:

> 23. [Lieutenant Colonel (LtCol) Bradley E.] Ward took command of MWSS-373 in 2015.
>
> 24. [Major (Maj)] Benbow has been the Executive Officer of MWSS-373 since 2014.[3]
>
> 25. In March 2016, LtCol Ward deployed with a Forward Deployed Element (FDE) of approximately 300 Marines from MWSS-373.
>
> 26. When the FDE deployed, Maj Benbow was the Officer-in-Charge of the Remain Behind Element (RBE) of approximately 175–275 Marines.

---

[3] Major Benbow testified that the date was 2015. The discrepancy does not affect this Court's analysis.

27. Prior to the FDE's deployment, LtCol Ward discussed with the MAG-11 Commanding Officer, Colonel (Col) Swann, how the RBE would function in LtCol Ward's absence.

28. It was LtCol Ward's intent that the RBE would continue to support MAG-11, 3d MAW and MCAS Miramar in his absence. Maj Benbow was to have the "full authorities" as commanding officer.

29. LtCol Ward's intent was for Maj Benbow to make all the decisions normally reserved to the commanding officer.

30. Major Benbow was responsible for supervising the company commanders of MWSS-373 and reported directly to the MAG-11 Commanding Officer.

31. Maj Benbow would receive tasking from higher headquarters and execute the mission without having to get approval from LtCol Ward.

33. Maj Benbow signed reenlistment packages, awarded certificates of commendation, awarded Navy Marine Corps Achievement medals and issued Military Protective Orders as the acting commanding officer of MWSS-373.

34. LtCol Ward's intent with regard to the scope of Maj Benbow's authority and how the RBE would operate was approved by Col Swann.

35. Maj Benbow was also designated in writing as the "acting" commanding officer of MWSS-373. The terms of the delegation letter center around Maj Benbow's authority to sign official correspondence as the acting commanding officer.

36. There were limits to Maj Benbow's authority as acting commanding officer. Maj Benbow was not authorized to hold Article 15, UCMJ, Nonjudicial Proceedings. Nor did she have the authority to convene courts-martial.

Footnote omitted.

The record of trial reveals various additional facts relevant to this appeal. Lieutenant Colonel Ward and other Marines assigned to the FDE deployed to Bahrain, Iraq, Jordan,

and Kuwait for a period of six months. During the deployment, they were attached to the Special Purpose Marine Air-Ground Task Force, Crisis Response-Central Command. While deployed, Lieutenant Colonel Ward reported to a senior officer outside of the 3D Marine Aircraft Wing. During this time, Lieutenant Colonel Ward and Major Benbow believed that Lieutenant Colonel Ward remained the official commander of all of MWSS-373. They testified that Lieutenant Colonel Ward had granted Major Benbow authority internally within the squadron, and not as a result of the Secretary of the Navy delegating her authority. Similarly, they both agreed that the FDE and RBE were not separate units within MWSS-373. Major Benbow continued to report to Lieutenant Colonel Ward and to follow his orders.

During the deployment, communication between Lieutenant Colonel Ward and Major Benbow was possible but often delayed. While Lieutenant Colonel Ward was in Kuwait, he had a telephone and access to the internet. But Lieutenant Colonel Ward testified that when the RBE received tasking orders, the orders would go directly to Major Benbow, and he would not learn of them until "a day or two later." He further testified that "every time we went to Iraq . . . it would have been very difficult to get in touch with me." He also testified that the difficulty of communication with Major Benbow was "why [he] left her in charge" during his absence.

The military judge denied the motion to suppress the evidence, ruling that Major Benbow was competent to authorize the searches and seizures "in her capacity as the acting commanding officer of MWSS-373." The military judge reasoned that "Maj Benbow was more than just the OIC [officer in charge], she was the acting commander and tasked with the employment of the RBE portion of MWSS-373." In reaching this conclusion, the military judge relied on the facts that Major Benbow "had complete responsibility and authority to receive tasking directly from MAG-11 and employ the companies of the MWSS-373 as she saw fit to meet the mission requirements without prior approval from LtCol Ward," and that Major Benbow was "employed in substantially the same manner as the other squadron commanders within MAG-11." Although Lieutenant Colonel Ward had withheld authority from Major Benbow to convene courts-martial and impose

nonjudicial punishment, the military judge reasoned that this limitation did not affect her ability to authorize searches under M.R.E. 315. The military judge explained that "the ability to convene courts-martial and hold Nonjudicial punishment is not the test of whether someone qualifies as a commander." The military judge further reasoned that Lieutenant Colonel Ward's delegation letter "was but one part of the steps taken by the chain of command to establish Maj Benbow as not just an RBE OIC, but to establish Maj Benbow as a commander."

## C. Appeal to the NMCCA

On appeal, the NMCCA disagreed with the military judge's conclusion that Major Benbow was competent to issue the search and seizure authorizations. The NMCCA emphasized three points. First, Lieutenant Colonel Ward continued to be the official commander of MWSS-373 during his deployment and in this capacity he actively commanded both the FDE and RBE while he was away. 79 M.J. at 544. Second, Lieutenant Colonel Ward did not seek or obtain official authority to establish an RBE that would function as an independent unit. *Id.* Third, Major Benbow did not fully assume command because, among other things, she regularly reported to Lieutenant Colonel Ward about the RBE's activities. *Id.*

Having determined that Major Benbow was not competent to authorize the searches and seizures, the NMCCA reasoned that the evidence obtained from them should have been excluded under the exclusionary rule in M.R.E. 311(a) unless some exception applied. *Id.* at 548. The NMCCA then determined that the requirements for the good faith exception in M.R.E. 311(c)(3) and for the inevitable discovery exception in M.R.E. 311(c)(2) were not met. *Id.* at 550, 552. The NMCCA also concluded that the benefits of deterrence from exclusion outweighed the costs to the justice system under the balancing test in M.R.E. 311(a)(3). *Id.* at 555. The NMCCA finally determined that the evidence obtained from the unauthorized searches prejudiced Appellee with respect to all of the specifications except for the fraternization specification. *Id.* at 556–57.

## II. Discussion

### A. Certified Issue I

The first certified issue concerns Major Benbow's competence to authorize the searches and seizures at issue in this case. M.R.E. 315(d) provides in pertinent part: "A search authorization under this rule is valid only if issued by an impartial individual in one of the categories set forth in subdivision (d)(1) and (d)(2)." Subdivision (d)(1) sets forth this category:

> A commander or other person serving in a position designated by the Secretary concerned as either a position analogous to an officer in charge or a position of command, who has control over the place where the property or person to be searched is situated or found, or, if that place is not under military control, having control over persons subject to military law or the law of war.

M.R.E. 315(d)(1).[4]

Appellee contends that Major Benbow could not authorize, under M.R.E. 315(d)(1), the searches and seizures at issue because she was not made the commander or acting commander of MWSS-373 by any regulation or valid order. The Government, however, argues that Major Benbow could authorize the searches and seizures under M.R.E. 315(d)(1) because Lieutenant Colonel Ward's power to authorize searches as the commander of MWSS-373 "devolved" upon Major Benbow.[5]

This Court reviews a military judge's "denial of a motion to suppress for an abuse of discretion." *United States v. Eppes*, 77 M.J. 339, 344 (C.A.A.F. 2018).[6] Based on our precedents,

---

[4] M.R.E. 315(d)(2) concerns searches authorized by a military judge or magistrate. Neither party contends that subdivision (d)(2) is relevant in this case.

[5] The Government does not contend that Lieutenant Colonel Ward or any other commander formally detailed Major Benbow to serve as the commander of MWSS-373 under Navy regulations. The Government also does not contend that MWSS-373 was formally divided into two units.

[6] We are not persuaded by Appellee's argument that we are required to review the NMCCA's decision for an abuse of discretion.

we agree with the Government that the military judge did not abuse his discretion.

The leading case on the devolution of a commander's power to authorize searches is *United States v. Kalscheuer*, 11 M.J. 373 (C.M.A. 1981). In that case, a deputy base commander authorized a search while the base commander was touring base facilities several kilometers away. *Id.* at 374. This Court decided that commanders cannot *delegate* to subordinates their power to authorize searches. *Id.* at 376–77. The Court reasoned:

> [T]here is a serious Fourth Amendment problem with the reasonableness of a search authorized by a person purporting to act under a commander's delegation—especially when almost no standards have been provided for such delegation. Moreover, the existence of this problem suggests that, absent the most persuasive evidence of legislative intent to the contrary, the Uniform Code should not be interpreted to allow such delegation.

*Id.* at 376. But the Court recognized that such authority could *devolve* upon subordinates when the commander is absent. The Court explained:

> [J]ust as other duties devolve upon a deputy commander . . . when, for some reason, a commander is unavailable, so, too, the responsibility to act on a request for search should in such a situation be viewed as devolving on the subordinate who exercises command when the commander is absent.

*Id.* at 378–79.

---

> When reviewing a decision of a Court of Criminal Appeals on a military judge's ruling, [this Court] typically ha[s] pierced through that intermediate level and examined the military judge's ruling, then decided whether the Court of Criminal Appeals was right or wrong in its examination of the military judge's ruling.

*United States v. Keefauver*, 74 M.J. 230, 233 (C.A.A.F. 2015) (internal quotation marks omitted) (quoting *United States v. Cabrera-Frattini*, 65 M.J. 241, 246 (C.A.A.F. 2007)).

Applying these principles, the Court in *Kalscheuer* reasoned that a devolution of power had occurred based on several facts. One fact was that the commander had left his portable radio, a "symbol of authority," with the deputy commander. *Id.* at 379. Another fact was that the deputy commander rather than the commander, "[a]t that time and place . . . was the person making command decisions." *Id.* A third fact was that "under the prevailing circumstances, [the deputy commander] was the officer whom foreseeably an investigator . . . would have approached to obtain a search authorization." *Id.*

The Court in *Kalscheuer* notably recognized that then-existing Air Force regulations provided for the devolution of command under certain circumstances. *Id.* at 380. But the Court did not consider those regulations to provide the exclusive means by which devolution of power could occur. *Id.* The Court explained: "[W]e are chiefly concerned with the functional aspects of command. Thus, we need not examine the minutiae of Service directives which concern devolution of command." *Id.*

This Court followed *Kalscheuer* in *United States v. Law,* 17 M.J. 229 (C.M.A. 1984). In *Law*, the Court held that a commander's power to authorize a search had devolved upon his executive officer when the commander was out of communication while attending a play rehearsal at a location where there was no telephone. *Id.* at 234. The commander in *Law* had attempted to delegate search authority to the executive officer, contrary to the decision in *Kalscheuer* that such authority cannot be delegated. *Id.* at 240. This Court nonetheless upheld the search, explaining:

> We need not . . . concern ourselves with the validity of the delegation, because, at the time of the search, [the executive officer] was exercising command authority over the unit. [The company commander] was some 27 or 28 kilometers away at a place where he could not be reached by phone. Thus, he was at least as unavailable as was the commander in *Kalscheuer,* so as acting commander—even without any express delegation—[the executive officer] was empowered to authorize the search.

*Id.* at 240–41.

Taken together, *Kalscheuer* and *Law* stand for the proposition that the power to authorize a search may devolve from a commander upon a subordinate even if a specific regulation does not provide for the devolution.[7] Whether a devolution occurs depends on a functional analysis. The question is whether the subordinate is in fact functioning as a commander while the commander is absent from the command. As the above descriptions show, in deciding whether a devolution occurred in *Kalscheuer* and *Law*, this Court considered several relevant facts: (1) the location of the commander; (2) the accessibility of the commander; (3) whether the commander contemplated a devolution of authority; (4) whether the deputy was exercising command functions; and (5) how others within the unit understood the role and authority of the deputy.

In this case, facts similar to those present in *Kalscheuer* and *Law* lead us to conclude that Lieutenant Colonel Ward's power to authorize searches devolved upon Major Benbow at the time and place the search authorizations were requested. First, Lieutenant Colonel Ward not only was absent from the Marines in MWSS-373 who remained at MCAS Miramar while he was deployed in Bahrain, Iraq, Jordan, and Kuwait, but also was much farther away and was gone for a longer time than the commanders in *Kalscheuer* and *Law*. Second, communication between Lieutenant Colonel Ward and Major Benbow was possible (except perhaps when Lieutenant Colonel Ward was traveling in Iraq) but it was usually delayed by a "day or two," much longer than the delay caused by the commander's attendance of a play rehearsal in *Law*. Third, Lieutenant Colonel Ward intended that Major Benbow would exercise command authority, providing written directives that she was "to have the 'full authorities' as commanding officer," according to the findings of the military judge. Fourth, Major Benbow in fact exercised command functions. As the military judge found, Major Benbow

---

[7] In addition to *Kalscheuer* and *Law*, several earlier precedents also concerned the devolution of a commander's powers. *See United States v. Bunting*, 4 C.M.A. 84, 15 C.M.R. 84 (1954); *United States v. Williams*, 6 C.M.A. 243, 19 C.M.R. 369 (1955); *United States v. Murray*, 12 C.M.A. 434, 31 C.M.R. 20 (1961); *United States v. Kugima*, 16 C.M.A. 183, 36 C.M.R. 339 (1966).

supervised "the company commanders of MWSS-373 and reported directly to the MAG–11 Commanding Officer," and she also "signed reenlistment packages, awarded certificates of commendation, awarded Navy [and] Marine Corps Achievement medals and issued Military Protective Orders as the acting commanding officer of MWSS-373." In addition, Major Benbow carried out tasking orders to MWSS-337 and only informed Lieutenant Colonel Ward about them after the fact. Finally, the investigators understood that they should seek search authorizations from Major Benbow, whose signature block on the search authorizations bore the title of "Acting Commander" or similar variations.

Appellee does not substantially dispute the foregoing similarities between this case and the *Kalscheuer* and *Law* precedents. But Appellee contends that the devolution of power still could not occur in this case for four principal reasons. First, Appellee argues that devolution could not have occurred because Major Benbow did not have complete authority over military justice while Lieutenant Colonel Ward was absent. As the military judge found, Lieutenant Colonel Ward did not permit Major Benbow to convene courts-martial or impose nonjudicial punishment. According to Appellee, a devolution of command is "all-or-nothing." Appellee maintains that if an officer succeeding command does not possess all of the authorities held by his or her predecessor, then the officer is not a "commander" by devolution. For this proposition, Appellee relies on *Bunting*, 4 C.M.A. at 87–90, 15 C.M.R. at 87–90.

We are not persuaded by this argument. Our precedents have not required a complete devolution of command authority. Indeed, we agree with the Government's position that *Bunting* actually shows the opposite of what Appellee asserts.[8] In *Bunting*, while the Commander Naval Forces, Far

---

[8] During oral argument, counsel for the Government asserted that Lieutenant Colonel Ward may have been mistaken in believing that he could limit the devolution of authority to convene courts-martial. The Government pointed to Dep't of the Navy, Article 1026.1, United States Navy Regulations, Precedence, Authority and Command ch. 10, § 2 (Sept. 14, 1990) [hereinafter Article 1026.1], which provides that an officer who succeeds to command

East, was absent from his command, his chief of staff served as the acting commander for " 'practically all administrative matters' " but not for operational matters. *Id.* at 86, 15 C.M.R. at 86. We nonetheless concluded that the chief of staff had authority to convene a court-martial. *Id.* at 89, 15 C.M.R. at 89. This Court did not consider the chief of staff's lack of power over operational matters or some administrative matters to preclude this authority. *See also Kugima*, 16 C.M.A. 187, 36 C.M.R. at 343 (citing *Bunting* for the proposition that command can devolve on a subordinate even if the actual commander retains some operational functions). In addition, we note that in *Kalscheuer* and *Law*, this Court addressed only the question whether power to authorize searches had devolved and did not consider whether other powers also devolved.

Second, Appellee argues that a devolution of power to issue search authorizations could not occur in this case because the conditions for devolution under applicable regulations were not satisfied. Appellee points to a U.S. Navy Regulation, Article 1026.1, which provides: "An officer who succeeds to command due to incapacity, death, departure on leave, detachment without relief or absence due to orders from competent authority of the officer detailed to command, has the same authority and responsibility as the officer whom he or she succeeds." Appellee contends that Lieutenant Colonel Ward was not incapacitated, dead, on leave, or detached. In addition, although Lieutenant Colonel Ward was deployed, Appellee argues that he was not "absent" from his command because the majority of MWSS-373 was deployed with him. Appellee concludes that this regulation therefore precludes the devolution of the power to authorize searches. We disagree with this argument. Article 1026.1 identifies certain circumstances in which devolution of command automatically occurs. But as in *Kalscheuer*, we do not believe that the regu-

---

because of the "absence . . . of the officer detailed to command" possesses the "same authority and responsibility as the officer whom he or she succeeds." We need not decide this point because Major Benbow did not attempt to convene a court-martial in this case and our precedents have not required a complete devolution of authority.

lation precludes devolution from occurring in other circumstances. Accordingly, we conclude that the devolution still occurred under the facts as explained above.

Third, Appellee argues that devolution could not occur because Major Benbow never exercised authority over the entire MWSS-373. Appellee asserts that even if Lieutenant Colonel Ward temporarily allowed Major Benbow to exercise some authority over the Marines in the RBE, Lieutenant Colonel Ward was always in complete command of the Marines in the FDE. Appellee also emphasizes that Lieutenant Colonel Ward at points directed some actions of Major Benbow over the RBE.

We agree that a unit cannot have two commanders exercising the same functions simultaneously. *See Kugima*, 16 C.M.A. at 187, 36 C.M.R. at 343. But command authority can devolve temporarily upon a subordinate during periods when, and in locations where, the detailed commander is unavailable. In *Kalscheuer*, we emphasized that the executive officer was the officer who was exercising command "[a]t that time and place" the search authorization was requested, and he was the officer from whom investigators understood that they should seek a search authorization. 11 M.J. at 379. That is precisely the situation in the present case. At the time when the investigating agents sought their search authorizations, Major Benbow was the officer exercising the functions of command at MCAS Miramar, and the investigators at MCAS Miramar understood that they were to ask her for the authorizations. The possibility that Lieutenant Colonel Ward at points may have directed some actions of Major Benbow over the RBE does not change this fact. *See Bunting*, 4 C.M.A. at 90, 15 C.M.R. at 90 (noting that "[a]t such times as [the commander] returned to his headquarters, he necessarily resumed command").

Fourth, Appellee argues that *Kalscheuer* is distinguishable because the commander in that case could not communicate with his deputy but in this case Major Benbow could and regularly did contact Lieutenant Colonel Ward while he was deployed. This distinction is not convincing. In *Kalscheuer*, this Court did not rest on grounds that the deputy base commander could not communicate with the base commander. On

the contrary, although the Court noted that the base commander had left his portable radio with the deputy commander, the Court observed that the base commander was accompanying a senior officer who had a radio. 11 M.J. at 374. In addition, Appellee does not sufficiently consider the practical limitations on Major Benbow's ability to communicate with Lieutenant Colonel Ward. While Major Benbow could contact Lieutenant Colonel Ward, the communication was often delayed by "a day or two" and may not have been possible while Lieutenant Colonel Ward was in Iraq.[9] These limitations are greater than those in *Kalscheuer* and *Law*, where the commanders were only temporarily out of touch while touring base facilities or attending a play rehearsal. Finally, the mere possibility of communication does not prevent the devolution of power. In *Bunting*, the chief of staff could communicate with the commander, who was often present at the command, but the ability to communicate was not enough to prevent devolution of the commander's powers because the commander was too busy with other duties to address administrative matters. *See* 4 C.M.A. at 88, 15 C.M.R. at 88.

In addition to these four arguments, we note that the NMCCA distinguished *Kalscheuer* and *Law* on the grounds that Lieutenant Colonel Ward's absence from MCAS Miramar was preplanned while the absences in *Kalscheuer* and *Law* were temporary. 79 M.J. at 547. We agree with the Amicus Curiae in support of the Government that this distinction does not prevent the devolution of the power to authorize searches and seizures. In *Kalscheuer* and *Law*, this Court did not focus on the reason for the commander's absence. The Court stressed instead the fact of the commander's absence and the other facts concerning the deputy's exercise of command.

For all of these reasons, we conclude that this case is indistinguishable from *Kalscheuer* and *Law*. Major Benbow was competent to issue the search and seizure authorizations in

---

[9] Indeed, although Lieutenant Colonel Ward testified that around the time of the initial search authorization, he was likely in Kuwait—where he had phone and internet access—he could not recall the exact dates he was there.

this case because the power to do so devolved upon her. Certified issue I is answered in the affirmative.

## B. Certified Issues II and III

Because we have determined that Major Benbow was competent to authorize the searches and seizures in this case, the exclusionary rule in M.R.E. 311(a) does not apply. Accordingly, we need not address certified issue II, which concerns the balancing test in M.R.E. 311(a)(3). We also need not address certified issue III, which concerns the good faith exception to the exclusionary rule in M.R.E. 311(c)(3).

## III. Conclusion

Although we uphold the search authorizations in this case, we conclude by observing that much of the uncertainty and litigation over the searches and seizures was avoidable. When commanders know that they will be absent for foreseeable, long-term periods, they can avoid legal controversies regarding authority over military justice matters by taking the formal steps required by service regulations to ensure clarity regarding this authority. They need not rely on the possibility of the implied devolution of their powers upon a subordinate officer.

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed as to the Specification of Additional Charge I for fraternization. It is reversed as to setting aside the remaining findings and reversed as to setting aside the sentence. The record is returned to the Judge Advocate General of the Navy for remand to the NMCCA for further review under Article 66, UCMJ, 10 U.S.C. § 866 (2018).